IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

CELLAIRIS FRANCHISE, INC. and : 
GLOBAL CELLULAR, INC.,  :
 :
    Plaintiffs,  :
 :   CIVIL ACTION
v.  :   NO. 2:15-cv-00101-WCO
 :
MICHAEL DUARTE,  :
 :
    Defendant.  :

## ORDER

The court has before it for consideration plaintiffs' motion for preliminary injunction [5, 27] against defendant Michael Duarte. Defendant has responded in opposition to plaintiffs' motion [32].

## I.    Factual Background and Procedural History

Plaintiffs Cellairis Franchise, Inc. ("Cellairis") and Global Cellular, Inc. ("Global") are affiliated companies that provide cellular telephone, and other wireless device, accessories and repair services across the United States and internationally. (Skouras Decl. ¶¶ 3–4, 12, ECF No. 5-2). Cellairis owns and operates a franchise system of Cellairis® merchandise units, kiosks, in-line stores, and physical facilities ("business units"), which sell both Cellairis® and other branded products. *Id.* ¶ 4.

Plaintiff Global owns Cellairis trademarks, which it licenses out to franchisees and business units for operation. *Id.* ¶ 7–8. Global is also involved in finding, negotiating, and leasing favorable retail space (typically in shopping malls) to open business units, which it then subleases to Cellairis franchisees. *Id.* ¶ 9. In the course of procuring space for these business units, Global maintains a business relationship with mall operators nationwide. *Id.* ¶ 10.

Plaintiffs allege that the cell phone and wireless device accessory-and-repair industry is "extremely" competitive due to a low cost of entry and an emphasis on favorable business-unit locations. *Id.* ¶ 13. As a part of their franchising, plaintiffs require franchisees and their principals to agree to restrictive covenants, including non-competition and non-disclosure, both during and for a period after the termination of the franchisor–franchisee relationship. *Id.* ¶ 19. Plaintiffs allege that these covenants are necessary to protect the franchise system from improper competition, maintain brand value, guard confidential techniques and information, and preserve company goodwill. *Id.* ¶¶ 21–24.

Michael Duarte claims he met Kostantinos Skouras, Jaime Brown, and Joseph Brown ("plaintiffs' principals") around 1995. (Duarte Decl. ¶ 2, ECF No. 19). At the time, defendant was managing partner of Lightbulbs Unlimited, Inc., a lighting supply store for AT&T and Cingular outlets. *Id.* ¶ 2. He met plaintiffs' principals in their

capacity as nightclub promoters interested in the purchase of disco lights for their venue(s). *Id.* ¶ 2.

In 1998, Mr. Duarte claims he began working in the cellular and mobile device industry with Wireless Dimensions, Inc. ("Wireless Dimensions"), which is where he first fostered relationships with mall operators for leasing opportunities. *Id.* ¶ 3. Mr. Duarte claims that his relationships with major mall developers, including General Growth Properties, Simon, CBL & Associates, Macerich, Taubman, and Westfield, arose between 1998 and 2005 and preceded those of plaintiffs. *Id.* ¶ 4. During his time with Wireless Dimensions, Mr. Duarte allegedly negotiated over 250 lease agreements with mall operators and opened 150 outlets. *Id.*

Around 2005, defendant Michael Duarte began working for plaintiff Global and subsequently with the affiliated Cellairis when it was formed later that year. (Skouras Decl. ¶¶ 25–26, ECF No. 5-2). During his tenure with plaintiffs, Mr. Duarte served in various capacities including independent contractor and employee for Global, as well as officer and vice president for both companies at different times. *Id.* ¶ 28. The timeline for when Mr. Duarte occupied each status during the relationship is not entirely clear. (Duarte Decl. ¶¶ 13, ECF No. 19,).

To facilitate a stable system of business units for Global and Cellairis, Mr. Duarte was involved in finding and negotiating leases with mall operators.

(Skouras Decl. ¶ 29, ECF No. 5-2). Mr. Duarte claims that he was asked to utilize the relationships he had developed during his time at Wireless Dimensions and that he introduced Global Cellular to many, if not all, of the mall operators with which it currently does business. (Duarte Decl. ¶¶ 5, 7, 9, ECF No. 19). As a result of his efforts, he explains, Cellairis was able to open approximately 250 franchises nationwide between 2005 and 2006 and negotiated another 500 leases between 2006 and 2012. *Id.* ¶ 10, 11.

In August 2014, Mr. Duarte ended his employment with Global but continued to serve as an independent contractor in largely the same capacity and with largely the same duties. (Skouras Decl. ¶ 30, ECF No. 5-2). During this time, Mr. Duarte also continued to serve as an officer of both Global and Cellairis. *Id.* ¶ 31.

Between March and May of 2011, a company called Mobile Mania, LLC ("Mobile Mania"), of which Mr. Duarte was part owner and principal, acquired rights to operate three Cellairis business units at malls in Washington and Oregon: (1) Columbia Center in Kennewick, Washington, (2) Bellis Fair in Bellingham, Washington, and (3) Pioneer Place Mall in Portland, Oregon. *Id.* ¶ 32–36. In May 2013, Mobile Mania entered into a fourth franchise agreement for another business unit at Boise Mall in Boise, Idaho. *Id.* ¶ 37. Each of these four franchises is still active, and in each of these franchise agreements Mr. Duarte signed as personal

guarantor. *Id.* 32–36, 38. Mr. Duarte claims that he has never visited and is not involved in any way with the day-to-day management and operation of these franchises. (Duarte Decl. ¶¶ 16–17, ECF No. 19).

Section 8(D) of the agreements used in setting up these franchises, entitled "Restrictive Covenants," provides in relevant part that franchisees and "bound part[ies]," which include personal guarantors, *during* the term of the agreement

> shall not . . . directly or indirectly, for and on behalf of itself, . . . (a) have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business . . . , within the United States or (b) perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for a Competitive Business, within the United States.

(Franchise Agreement 44–45, 74, ECF No. 1-1).

Section 8(D)(2) also explains that for two years *after* the termination of the agreement for any reason, including a "*transfer*" of interests, franchisees and bound part[ies]

> shall not, . . . (a) have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business or (b) perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for a Competitive Business which, in either case, is located or operating (i) at [their franchise location], or (ii) within a ten (10) mile radius of [their franchise location], or (iii) within a ten (10) mile radius of any Cellairis Business Unit located in a freestanding building or in-line retail plaza[,] . . . shopping mall, or any other . . . retail facilities.

*Id.* at 45 (emphasis added).

The agreement defines "Competitive Business" as "any business operating, or granting franchises or licenses to others to operate, a business that specializes in offering cellular telephone accessories, other wireless device accessories and/or related products and services including cellular telephone and wireless device repair . . . ." *Id.* It does not, however, prohibit "owning securities in a Competitive Business if they are listed on a recognized stock exchange or traded on the over-the-counter market and represent 5% or less of the number of shares of that class of securities which are issued and outstanding." *Id.* at 46. Additionally, franchisees and bound parties

> shall not, for two (2) years following the effective date of termination or expiration of this Agreement for any reason, or following the date of a transfer by FRANCHISEE or any Bound Party, directly or indirectly, for and on behalf of itself . . . or any other person or entity, solicit, or attempt to solicit, directly or indirectly, any of the end-retail customers with whom FRANCHISEE or the Bound Party had [business interactions] during the last two years of the Term of the Franchising Agreement, for the purpose of providing products or services competitive with those which were provided by FRANCHISEE from the Business Unit.

*Id.* at 46–47.

Plaintiffs allege that Mr. Duarte, as part owner and principal of multiple Cellairis franchises, long-time employee of Global, and officer of both companies, had and continues to have access to plaintiffs' confidential information and trade secrets about business unit operations. (Skouras Decl. ¶¶ 43–45, ECF No. 5-2). Perhaps most

importantly among these secrets are plaintiffs' business location and leasing strategies. *Id.* at ¶ 46. Mr. Duarte claims that he never received any of the proprietary manuals, guidelines, or product catalogs in connection with his franchises. (Duarte Decl. ¶ 18, ECF No. 19). He also contends that his franchises were the result of subleasing agreements wherein Global Cellular and Cellairis never shared leasing agreement information or location viability data with him or Mobile Mania. *Id.* ¶ 19.

Mr. Duarte claims that in 2013 plaintiffs' business was becoming stagnant and that he aided them in international expansion and obtaining rent concessions to stabilize business in the United States. (Duarte Decl. ¶¶ 20–22, ECF No. 19). He claims that around July of 2014, due to these financial concerns, he was removed from his position as Vice President and hired as an independent contractor. *Id.* ¶ 24. During the turmoil in his position with plaintiffs, it appears that Mr. Duarte sold his interest in Mobile Mania to Ryan Spath on April 27, 2015. *Id.* ¶ 41; *see also* Ex. 12, ECF No. 19-12.

On March 4, 2015, Mr. Duarte resigned from his positions with plaintiffs, which he attributes to not having been paid properly. (*See* Duarte Decl. ¶ 27, ECF No. 19). Plaintiffs have not denied the payment issue but claim that Mr. Duarte informed them that his departure was motivated by opportunities in the solar energy industry. (Skouras Decl. ¶¶ 48–49, ECF No. 5-2). Instead of solar energy, however,

plaintiffs allege that Mr. Duarte is now engaged in the operation of at least two competing businesses in the telephone and wireless device accessory-and-repair business: (1) "Quick Fix" in the Staten Island Mall, New York, and (2) "Fix Color & More" in the Mall at Short Hills, New Jersey. *Id.* ¶¶ 52, 56. Cellairis purports to operate a business unit in the Staten Island Mall as well as several units within 30 miles of the Mall at Short Hills location, including a business unit in a different mall 5 miles away. *Id.* ¶ 52, 58. Moreover, plaintiffs allege that Mr. Duarte has been in contact with multiple leasing agents from Simon Malls, a business contact of plaintiffs, to negotiate opening wireless accessory-and-repair stores in other locations. *Id.* ¶¶ 61–62.

In May 2015, Mr. Duarte attended at least two leasing conferences in Las Vegas, Nevada. *Id.* ¶¶ 62–63. Plaintiffs contend that Mr. Duarte could have no reason to attend these conventions other than to network with mall operators for the purpose of seeking wireless-device-related leasing opportunities in violation of the non-compete agreement. *Id.* ¶¶ 64–65. Defendant responds that he attended these type conferences before he became associated with plaintiffs and that these "trade shows" attract participants from numerous industries including cosmetics, clothing, toys, electric massage, pain relief, body jewelry, teeth whitening, and belt buckles. (Duarte Decl. ¶¶ 8, 39, ECF No. 19).

After discovering that defendant attended these conventions, plaintiffs allegedly made a demand on Mr. Duarte to return confidential information and notified him that he was violating the restrictive covenants in the franchise agreement. (Skouras Decl. ¶ 70, ECF No. 5-2). Plaintiffs claim that Mr. Duarte has not been responsive to these communications.

Mr. Duarte alleges that due to the fact that his solar energy venture has yet to broker any agreements with target clients, he has been required to seek consulting opportunities in real estate development and leasing. (Duarte Decl. ¶ 34, ECF No. 19). He claims that he has not *actively* solicited clients in the mobile and cellular accessories business but that others, including a certain Uzeyir Tari, have sought him out to negotiate lease agreements for business sites including in-line cellular repair stores, holiday ornament locations, and clothing. *Id.* ¶ 34.

Due to arbitrability concerns in the franchise agreement at issue, the court granted defendant's motion to compel arbitration in an order dated July 20, 2015. (Order 18–19, ECF No. 24). At that time, the court denied plaintiffs' motion for preliminary injunction, without prejudice, and stayed the case pending a determination by the arbitrator. *Id.* at 18. The arbitrator ruled that plaintiffs may pursue an injunction in this court. (Arbitration Order 2, ECF No. 28-1). Plaintiffs have since renewed their motion and sought a hearing. On September 25, the court lifted the stay

on the case and granted a hearing. Due to scheduling conflicts of the defendant, however, a timely hearing could not be set. Thus, after confirming that all relevant evidence by both parties was before the court, the hearing was cancelled and the court took the motion under advisement.

## II. Legal Analysis

A party seeking preliminary injunction must establish the following four elements: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Lebon v. Sec'y, Fla. Dep't of Children and Families*, 710 F.3d 1202, 1206 (11th Cir. 2013) (citation omitted). "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1518 (11th Cir. 1983) (citation and internal quotations omitted). This court finds that plaintiff movants have met their burden on all four prerequisites, which will be discussed in the sections that follow. After that discussion, the court will address the issue of plaintiffs' being required to post a bond, which was also implicated in their motion.

*A.     Substantial Likelihood of Success on the Merits*

The first element, likelihood of success on the merits, pertains to whether movants will likely win on their underlying case. Here, plaintiffs assert a basic breach of contract claim against defendant for violating the restrictive covenants present in the 2013 franchise agreement. (Pl.'s First Am. Compl., ECF No. 7, ¶ 1). A basic breach of contract claim requires a (1) valid contract, (2) material breach, and (3) damages. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 1, 236, 241 (1981). Mr. Duarte executed the 2013 franchise agreement as personal guarantor and thus, to the extent its restrictive covenants are enforceable and he has not asserted any defenses, he is bound by them. (Skouras Decl., ECF No. 5-2, ¶¶ 32–36, 38; Ex. B, ECF No. 7-2, at 4); *see Core LaVista, LLC v. Cumming*, 709 S.E.2d 336, 341 (Ga. Ct. App. 2011).

In 2010, the Georgia legislature passed a new, more lenient statutory provision governing the scope and enforceability of restrictive covenants. *See* O.C.G.A. § 13 8-50 to -59. Under Georgia law generally, the enforceability of a restrictive covenant is determined by whether "the covenant can be considered a 'reasonable' restraint on competition, given the circumstances of a particular case." *Carson v. Holding Co. LLC*, 734 S.E.2d 477, 481 (Ga. Ct. App. 2012) ("[T]he restraint imposed

must be reasonably limited and it must be 'reasonably necessary to protect the interest of the party in whose favor it is imposed.'" (citation omitted)).  As a question of law, then, a court must determine reasonableness through a three-part examination of the covenant, including its (1) duration, (2) territorial coverage, and (3) scope of activity prohibited. *Id.*  This analysis is applied strictly in employer–employee relationships and with medium scrutiny in professional partnership and shareholder agreements. *Id.* These three points of examination will be discussed in turn.

First, on the issue of duration, it is unclear which category of analytical scrutiny fits Mr. Duarte most readily because (during his tenure with Global and Cellairis) he occupied all number of positions, including employee, independent contractor, and officer. (Duarte Decl. ¶¶ 25, 28, ECF No. 19).  Yet even if Mr. Duarte is characterized as merely an employee under the stricter analysis, a durational restriction of two years or less is nonetheless presumptively reasonable under Georgia law. *See* O.C.G.A. § 13-8-57(b) ("In the case of a restrictive covenant sought to be enforced against a former employee . . . a court *shall presume to be reasonable* in time any *restraint two years or less* in duration. . . ." (emphasis added)); *see also id.* § 13-8-57(c) (specifying three years or less as presumptively reasonable when restricting former distributors, dealers, franchisees, lessees, and licensees).

In this case, the franchise agreement specifies a post-termination restriction of two years against engaging in competitive businesses within ten miles of a Cellairis business unit that was operational at the time of the agreement's termination. (Franchise Agreement 45, ECF No. 1-1).  Despite plaintiffs' arguments to the contrary, the term restriction for the life of the contract is not necessarily relevant to this analysis because Mr. Duarte sold his interest in April of 2015, and is thus subject, if at all, to the post-termination restrictive covenants only. (*See* Duarte Decl. ¶ 41, ECF No. 19; Ex. 12, ECF No. 19-12; Franchise Agreement 45, ECF No. 1-1 (specifying termination is triggered on "date of a transfer by FRANCHISEE or any Bound Party")).

Second, regarding territorial coverage, restrictive covenants specifying "[a] geographic territory which includes the areas in which employer does business at any time during parties' relationship, *even if not known at the time of entry* into the restrictive covenant, is reasonable provided that: (A) the total distance encompassed by the provisions of the covenant is also reasonable; . . ." O.C.G.A. § 13-8-56 (emphasis added).  The post-termination restriction at issue prohibits competition in three spatial settings: (i) at the franchisee's own location, "(ii) within a ten (10) mile radius of [that] Location, or (iii) within a ten (10) mile radius of any Cellairis Business

Unit *in operation and existence as of the termination date*." (Franchise Agreement 45, ECF No. 1-1) (emphasis added).

Comparing the statutory presumption with the present agreement, this court finds the 10-mile radial restriction to be reasonable. Despite their international presence, Global and Cellairis seek narrow restrictions on competition rather than wholesale prohibition within their geographic reach. (Skouras Decl. ¶¶ 3–4, 12, ECF No. 5-2; *see also* Duarte Decl. ¶ 11, ECF No. 19). Post-termination competition within only ten miles of then-existing Cellairis business units, including franchisee's own, is a fairly defined restriction in these circumstances and allows plaintiffs to re-license territory and protect other franchisees. *See Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1219 (S.D. Fla. 2014). Notable in this wording is that in seeking protection from unfair competition, plaintiffs' agreement does not seek to usurp new advantageous and uncultivated locations from potential competitors and previously associated parties. It is reasonable for plaintiffs to protect what they have already acquired without infringing on other, less settled territories.

Third, the activity restricted by the franchise agreement is quite narrow as well. Plaintiffs seek only to enjoin defendant from (1) having ownership in and (2) performing services for a "Competitive Business," which the agreement defines as a "business operating, or granting franchises . . . to others to operate, a business that

specializes in offering cellular telephone accessories, other wireless device accessories and/or related products and services including cellular telephone and wireless device repair . . . ." (Franchise Agreement 44–45, ECF No. 1-1). Regarding ownership, the agreement allows purchasing up to 5% of the outstanding shares in companies on a recognized exchange market. *Id.* at 46. Likewise, in terms of services, the agreement does not seek to enjoin activity entirely (in this case leasing and consulting) but rather to a limited subset of companies involved in the cellular phone and wireless device accessory-and-repair industry. (Pl.'s First Am. Compl. ¶ 1, ECF No. 7). Thus, it appears that defendant is free to utilize his leasing expertise in a different industry, including the others engaged by Mr. Tari, just not in cellular phone accessories and repair. The court finds it is reasonable for a franchisor to prohibit previous franchisees and parties bound by the franchise agreement, given likely sensitive information received in those capacities, from competing in the same industry during, and for a short time after, their agreement.

Given that the restrictive covenants in the franchising agreement appear reasonable, they are likely enforceable as an executed and valid contract as well. Moreover, defendant appears to admit that he has engaged in at least some activity related to businesses engaged in cellular phone accessories and repair. (*See* Duarte Decl. ¶ 34, ECF No. 19 (acknowledging that he has been approached to negotiate

leases for Mr. Tari, whose businesses includes in-line cellular repair stores)). Plaintiffs allege that the business with Mr. Tari in the Mall at Short Hills is also within the ten-mile radius restricted by the franchise agreement. (*See* Skouras Decl. ¶ 52, 56, ECF No. 5-2 (asserting a Cellairis business unit is located in another mall within five miles of the Fix Color & More allegedly negotiated by Mr. Duarte)). While there are a number of other alleged instances of unfair competition submitted to the court, most of them are difficult to substantiate at this time. *But see Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1212 (S.D. Fla. 2014) ("At the preliminary injunctive stage, the court may 'rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objections of the injunctive proceeding.'" (citing *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995))).

Plaintiffs also point to several email communications and text messages implicating admissions by Mr. Duarte that he is in violation of the non-compete provision of the franchise agreement. (Skouras Decl. ¶ 74, ECF No. 19; *see also* Brown Decl., ECF No. 5-22, ¶ 6; Skouras Second Decl. ¶¶ 21–23, ECF No. 21). The court finds that plaintiffs have provided sufficient evidence—at least for this stage of the proceedings—to meet their burden on proving a "substantial likelihood of success on the merits" for their underlying breach of contract claim seeking injunctive relief.

*B.     Irreparable Harm*

Plaintiffs make three main, and somewhat interrelated, arguments with respect to irreparable harm: (1) defendant has engaged in unfair competition, and (2) in working on behalf of competitors, defendant has likely disclosed plaintiffs' proprietary business techniques and strategies, and (3) such conduct dilutes the value and good will of the Cellairis brand and franchising system.

First, in terms of lost profits and business, plaintiffs' assertion that defendant is engaged in unfair competition is not necessarily compelling on its own. Financial instability due to competition is not an "irreparable" harm. However, plaintiffs' second assertion relating to confidential information and business tactics does carry weight. Plaintiffs assert that its industry is very competitive given its low cost of entry and the importance of business-unit location. *Id.* ¶ 13. For continued success in this industry, plaintiffs argue, it is important to know which retail spaces perform the best and to have contacts with the operators in control of those spaces. (Pl.'s Mot. for Prelim. Inj. 23, ECF No. 5-1).

Over the course of their expansion, plaintiffs have presumably developed knowledge and data about leasing locations for profitability and the overall health of their business. Defendant must also acknowledge this reality given his admitted

contribution to the leasing and opening of several hundred business units for plaintiffs, both domestically and abroad, during his tenure. (Duarte Decl. ¶¶ 10–11, ECF No. 19). It is likely then that defendant, in the course of consulting and negotiating leases on behalf of a competitor, would utilize and even have to disclose some of this knowledge developed in the course of his work with plaintiffs. These disclosures create harm by taking information on location viability that took years for plaintiffs to develop on their own and providing it, without the same investment, to their competitors in operating a similar business. In this case, it is "irreparable" because once that information is available for the competitor, it cannot be taken back. *See Cunningham v. Adams*, 808 F.Supp.2d 815, 821 (11th Cir. 1987) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").

Plaintiffs' third argument about the value of its franchise system and brand name also has merit. *See* § 13-8-51 (finding "legitimate business interests" include trade secrets, confidential information, business relationships, client good will, and specialized training). Disclosure of confidential information harms plaintiffs' good will, dilutes their brand value, and discourages potential franchisees from entering their franchise system. Moreover, competition (even indirect in nature) by ex-franchisees directly harms plaintiffs' current franchisees and undermines their franchise system. For the reasons discussed above, the court finds that plaintiffs have

shown that they will likely suffer irreparable harm if Mr. Duarte is not enjoined from those leasing and consulting activities that are in violation of the non-compete provision.

C. *Balancing of Potential Harms*

The established purpose of a preliminary injunction is to preserve the status quo. Here, the status quo is plaintiffs' ability to operate their business without improper competition based on disclosures to and assistance from a previous franchisee and business associate to its competitors. Not granting a preliminary injunction in this case would upset this status quo by allowing defendant to aid operations in violation of a non-compete provision to which he is bound. Plaintiffs have established that defendant's violations of the post-termination non-compete agreement risk disclosures that would damage their business reputation and undermine their franchise system.

Compared to this potential harm, defendant argues that an injunction would interfere with his ability to seek "gainful employment." (Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. 4, ECF No. 32). However, given Mr. Duarte's purported violations, such an argument is unpersuasive here. *See Winmark Corp v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014) ("Generally, a franchisee that has

breached the terms of its franchise agreement cannot then complain of harm from an injunction to prevent further violations of the agreement."). Given defendant's sizable tenure with plaintiffs in this case, his comfort and familiarity with negotiating leasing agreements in the cell phone and wireless device accessory-and-repair industry (and also his desire to resort to this convenient method of income) is understandable. However, it does not make this his only means of gainful employment and does not justify his aiding in unlawful competition. As such, the hardship plaintiffs could suffer without a preliminary injunction outweighs defendant's hardship from same.

D.    *Public Interest*

Public interest also weighs in favor of granting a preliminary injunction. The Georgia General Assembly found in its new restrictive covenant statute that "reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment favorable to attracting commercial enterprise to Georgia and keeping existing businesses within the state." *Id.* § 13-8-50; *see also* § 13-8-51 (finding "legitimate business interests" include trade secrets, confidential information, business relationships, client good will, and specialized training). Enforcement of such covenants for the purpose of protecting "legitimate business interests," enforcing valid contracts, and preventing unfair competition serves the public interest.

*E.    Bond*

The court *may* issue a preliminary injunction "only if movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ." FED. R. CIV. P. 65(c).  The amount of such a bond is a matter within the sound discretion of the court.  *See Carillon Importers, Ltd. v. Frank Pesce Int'l Group, Ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997).  The court notes that plaintiffs' franchise agreement had defendant agree to waive bond. *See Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014).  While the court is not bound by this provision,  defendant has not raised any arguments on this issue in his reply brief, and thus the court agrees that defendant is bound by the provision.

## III.    Conclusion

While reserving some questions of the restrictive covenants' enforceability and scope for future proceedings on the merits, the court finds that plaintiffs have met their burden for a preliminary injunction.  The court hereby **GRANTS** plaintiffs' motion for preliminary injunction [5, 27].

Defendant Michael Duarte, his agents, servants, employees, attorneys, and all other persons who are in active concert or participation with him, are hereby

21

**ENJOINED** from violating the restrictive covenants listed in plaintiffs' 2013 franchise agreement. Specifically they are prohibited from negotiating leases and consulting in the cellular phone and wireless device accessory-and-repair industry, including any activities involving the two business entities—Quick Fix and Fix Color & More—as well as any other entity or individual for which defendant may provide a similar service or possess ownership in violation of the post-termination restrictive covenant. This injunction shall remain in effect until further order of this court.

IT IS SO ORDERED, this 21st day of October, 2015.

s/*William C. O'Kelley*
William C. O'Kelley
Senior United States District Judge